MARC J. FAGEL (Cal. Bar No. 154425)
ROBERT TASHJIAN (Cal. Bar No. 191007)
    tashjianr@sec.gov
THOMAS J. EME (Illinois Bar No. 6224870)
    emet@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, 26th Floor
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV-09-2554 MMC |
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE |
| v. | |
| PETER C. SON, JIN K. CHUNG, SNC ASSET MANAGEMENT, INC., and SNC INVESTMENTS, INC., | |
| Defendants. | |

## Statement of Issues

1.     Whether evidence of defendants' fraud and illegal retention of investor funds establishes a likelihood that defendants will continue to violate the federal securities laws.

2.     Whether the Court should enter an order (i) enjoining defendants' violations of the federal securities laws; (ii) freezing defendants' assets, (iii) requiring defendants to account for investor funds, (iv) requiring defendants to repatriate assets to the United States, (v) authorizing expedited discovery, (vi) preventing the destruction of evidence, and (vii) ordering defendants to show cause why a preliminary injunction should not be entered.

## Table of Contents

**I.    INTRODUCTION**................................................................ 1

**II.   FACTS** ............................................................................. 2

   A.   SON AND CHUNG RAISED MILLIONS FROM
       INVESTORS BY PROMOTING SNCA'S PURPORTED
       FOREIGN CURRENCY  TRADING PROGRAM........................ 2

   B.   SON AND CHUNG OPERATED SNCA'S FOREX
       PROGRAM AS A PONZI SCHEME...................................... 4

      1.  *Analysis of Transfers Into and Out of SNCA*
        *Bank Account*............................................................ 5

      2.  *Comparison of Bank Records and Investment*
        *Account Statements*.................................................... 7

      3.  *Bank Account Records Show the Diversion,*
        *Comingling, and Misuse of SNCA Investor Funds*......... 8

   C.   SON AND CHUNG USED SNCI TO BOLSTER THE
       SNCA FRAUD ............................................................... 9

   D.   SON AND CHUNG DIVERTED FUNDS SHORTLY
       BEFORE THE COLLAPSE OF THE SCHEME ....................... 11

**III.  ARGUMENT**.................................................................. 12

   A.   THE STANDARD FOR ORDERING EMERGENCY
       RELIEF........................................................................ 12

   B.   DEFENDANTS VIOLATED THE FEDERAL
       SECURITIES LAWS ...................................................... 14

      1.  *The SNCA Forex Investments and Promissory*
        *Notes Are "Securities"* ............................................. 14

2.  *Son, Chung, SNCA, and SNCI Violated Section 17(a)*
      *of the Securities Act, Section 10(b) of the Exchange Act*
      *and Rule 10b-5 Thereunder* ............................................................ 15

C.   INJUNCTIVE AND OTHER RELIEF IS NECESSARY
     TO PREVENT FURTHER FRAUD AND PRESERVE
     INVESTOR FUNDS .................................................................... 17

     1.  *Restraining Order and Preliminary Injunction* ........................... 17

     2.  *Asset Freeze* .............................................................................. 18

     3.  *Accounting of Investor Funds* ..................................................... 19

     4.  *Repatriation of Assets* ............................................................... 19

     5.  *Expedited Discovery and Document Preservation* ...................... 20

IV.  CONCLUSION ............................................................................... 20

1

## __Table of Authorities__

2

**CASES**

3

*Aaron v. SEC*, 446 U.S. 680 (1980)............................................................................................ 16

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988)............................................................................... 16

*FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989).......................................................................... 18

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ..................................................... 18, 19

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ............................................................................................. 16

*Koehler v. Pulvers*, 614 F. Supp. 829 (S.D. Cal. 1985)............................................................. 16

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*,
    19 F.3d 449 (9th Cir. 1994) ................................................................................................. 13

*Navel Orange Admin. Comm. v. Exeter Orange Co.*,
    722 F.2d 449 (9th Cir. 1983) ............................................................................................... 13

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ............................................................................................. 13

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)............................................................................. 14

*SEC v. Bankers Alliance Corp.*,
    Civ. A. No. 95-0428, 1995 WL 590665 (D.D.C. May 5, 1995)............................................... 19

*SEC v. Chemical Trust,*
    No. 00-8015-CIV, 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000)........................................... 20

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) .................................................. 15, 16

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) ............................................................................... 17

*SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) .......................................................................... 18

*SEC v. Int'l Swiss Invs. Corp.*,
    895 F.2d 1272 (9th Cir. 1990) ......................................................................................... 18, 19

*SEC v. Manor Nursing Ctrs.*,
    458 F.2d 1082 (2d Cir. 1972)............................................................................................... 17

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975)................................................................................................. 13

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)............................................................................ 16

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ................................................. 18, 20

*SEC v. Unique Financial Concepts, Inc.*,
    196 F.3d 1195 (11th Cir. 1999) ................................................ 14

*SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) ........................................... 14

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) .......................................... 18

*SEC v. Zandford*, 535 U.S. 813 (2002) ............................................... 15, 16

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ........................... 15

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ................................................ 13, 17

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ................................. 16

*United States v. Odessa Union Warehouse Co-Op*,
    833 F.2d 172 (9th Cir. 1987) ................................................ 13

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ......................................... 15, 16

**STATUTES**

15 U.S.C. § 77b(a)(1) ............................................................... 14

15 U.S.C. § 77q(a) ................................................................ 15

15 U.S.C. § 77q(a)(2) .............................................................. 15

15 U.S.C. § 77t(b) ................................................................ 13

15 U.S.C. § 78c(a)(10) ............................................................. 14

15 U.S.C. § 78j(b) ................................................................ 15

15 U.S.C. § 78u(d) ................................................................ 13

**REGULATIONS**

17 C.F.R. § 240.10b-5 .............................................................. 15

**RULES**

Fed. R. Civ. P. 5.2 ................................................................. 2

Fed. R. Civ. P. 26(f) .............................................................. 20

Fed. R. Civ. P. 65(b)(2) ........................................................... 13

1  **I.    INTRODUCTION**

2         Defendants Peter C. Son and Jin K. Chung defrauded hundreds of investors in a

3  fraudulent scheme that raised at least $13.4 million in its last year alone.  Targeting Korean-

4  Americans in the San Francisco Bay Area, Son and Chung lured investors into a purported

5  foreign currency trading program with false promises of high returns, typically between 24 and

6  36 percent annually.  Son, Chung, and their companies, defendants SNC Asset Management, Inc.

7  ("SNCA") and SNC Investment, Inc. ("SNCI"), projected an aura of expertise in foreign

8  currency trading.

9         In truth, defendants operated a Ponzi scheme.  Incoming investor money was not invested

10  in foreign currency trading.  Instead, Son and Chung used investors' funds to pay "trading

11  returns" to certain investors and to enrich themselves.  Defendants further deceived investors by

12  providing them with monthly account statements that reported account balances that did not

13  exist.

14        The scheme collapsed in October 2008.  Son and Chung closed SNCA and SNCI, drained

15  the companies' bank accounts, and fled, leaving investors empty-handed.  In the process, Son

16  and Chung transferred substantial sums to offshore bank accounts.  Chung subsequently admitted

17  to a former employee that the trading returns had been faked.

18        Plaintiff Securities and Exchange Commission ("Commission") makes this *ex parte*

19  request for a Temporary Restraining Order (1) enjoining defendants from committing further

20  violations of the federal securities laws; (2) freezing defendants' assets to prevent further

21  dissipation of investor funds; (3) requiring defendants to provide an accounting of investors

22  funds; (4) requiring defendants to repatriate assets to the United States; (5) authorizing expedited

23  discovery in this action to locate investor assets and preventing defendants from altering or

24  destroying documents; (7) requiring defendants to show cause why the Court should not issue a

25  Preliminary Injunction and impose other relief against them.[1]

26  _____

27  [1] The Commodity Futures Trading Commission is simultaneously filing a related action for
    emergency relief to enjoin violations of the antifraud provisions of the Commodities Exchange
28  Act.

1    The Commission's Application for a Temporary Restraining Order is supported by this

2    Memorandum of Points and Authorities, the declarations of Commission attorneys **Thomas J.**

3    **Eme** and **Robert L. Tashjian**, the declarations of investors **Dale Baek, David Pak, and**

4    **Seunghee Yatsko**, excerpts of transcripts of the sworn testimony of **Jee Choi** (a former SNCA

5    administrative employee), **Young Choi** (a former SNCI managing director), and **Phil Ha** (a

6    former SNCA sales agent), all materials attached to the declarations, an appendix of unpublished

7    and other authority, the proposed orders lodged by the Commission, and such other oral or

8    written evidence as may be presented at the hearing.[2]

9    **II.    FACTS**

10    **A.    Son and Chung Raised Millions from Investors by Promoting SNCA's
             Purported Foreign Currency Trading Program**
11

12    Beginning no later than 2003, Son and Chung solicited investments in SNCA's purported

13    pooled foreign exchange trading program. *See* Eme Decl. ¶¶ 2, 6, 9, 14 & Exh. 1 ¶¶ 3, 4, 7

14    (Yatsko Decl.); Exh. 5 at 82:24-83:4 (Y. Choi transcript); Exh. 8 at 15:14-18:4, 23:11-13, 33:13-

15    25, 34:12-35:2 (J. Choi transcript); Exh. 13 at 24:16-25:13 (Ha transcript).  Foreign exchange

16    trading, or "forex" trading, involves the buying and selling of different currencies. *See id.* ¶ 2 &

17    Exh. 1 ¶ 3 & Tab A (Yatsko Decl.).  SNCA targeted Korean-American investors in the San

18    Francisco Bay Area, relying on personal sales efforts, advertisements in Korean-language

19    newspapers, and word-of-mouth to attract investor funds. *See id.* ¶¶ 9, 14 & Exh. 8 at 15:14-

20    17:12, 25:8-10, 26:16-27:2 (J. Choi transcript); Exh. 13 at 31:5-32:4 (Ha transcript).  The scheme

21    drew more than 500 investors from California and other states, South Korea, and Taiwan. *See id.*

22    ¶¶ 9, 16 (identifying list of more than 500 SNCA investors compiled by Commodity Futures

23    Trading Commission) & Exh. 8 at 23:11-13, 25:8-25 (J. Choi transcript) (estimating a total of at

24    least 250 or 300 SNCA investors); Exh. 15 (list of approximately 150 SNCA investors who

25

26    _____

27    [2] In accordance with Rule 5.2 of the Federal Rules of Civil Procedure, the Commission redacted
      personal identifying information from all supporting declarations and exhibits.  The Commission
      also redacted home addresses, personal telephone and facsimile numbers, identifying escrow
28    information, and SNCA account login codes and passwords from the exhibits to the declarations.

1    received promissory notes); *see also id.* ¶ 10 & Exh. 9 at PS 004817, 004297 (SNCA account

2    statements showing investor addresses in Washington and New York).

3            Son and Chung served as the Chief Executive Officer and Chief Financial Officer,

4    respectively, of SNCA.  *See* Eme Decl. ¶ 9 & Exh. 8 at 14:20-15:11 (J. Choi transcript).  As

5    SNCA executives, Son and Chung both personally offered and sold the forex trading program to

6    investors.  *See id.* ¶¶ 2-4, 9 & Exh. 1 ¶¶ 3-4 (Yatsko Decl.); Exh. 2 ¶¶ 6-7, 11 (Pak Decl.); Exh. 3

7    ¶¶ 2-4 (Baek Decl.); Exh. 8 at 27:3-14, 77:5-78:9 (J. Choi transcript).  Son and Chung described

8    to investors how the SNCA forex trading program worked and touted its supposed success.  *See*

9    *id.* ¶¶ 2-4 & Exh. 1 ¶¶ 3, 9, 17 (Yatsko Decl.); Exh. 2 ¶¶ 6-7, 11 (Pak Decl.); Exh. 3 ¶¶ 3-4 (Baek

10   Decl.).  They claimed that SNCA earned annual forex trading profits exceeding 50 percent.  *See*

11   *id.* ¶¶ 2-4 & Exh. 1 ¶ 3 & Tab A (Yatsko Decl.); Exh. 2 ¶ 6 (Pak Decl.); Exh. 3 ¶ 4 (Baek Decl.).

12   Son and Chung further represented that SNCA would use investor money to conduct forex

13   trading and provide investors with monthly returns ranging from two to three percent.  *See id.*

14   ¶¶ 2-4 & Exh. 1 ¶ 3 & Tabs D, E (Yatsko Decl.); Exh. 2 ¶¶ 6-7, 9 & Tab B (Pak Decl.); *see also*

15   *id.* ¶¶ 4, 9 & Exh. 3 ¶ 4 (Baek Decl.) (stating that Son promised 30 percent monthly returns);

16   Exh. 8 at 33:13-25 (J. Choi transcript) (testifying that investors were provided monthly returns of

17   two to three percent).  They also met with investors in SNCA's office, which featured multiple

18   monitors ostensibly used to view forex market conditions.  *See id.* ¶ 14 & Exh. 13 at 100:6-

19   101:25, 106:25-109:12, 115:15-119:1 (Ha transcript).

20           At Son and Chung's direction, SNCA sales agents sold the purported forex investment.

21   *See* Eme Decl. ¶¶ 9, 14 & Exh. 8 at 15:14-17:12 (J. Choi transcript); Exh. 13 at 14:7-11, 15:19-

22   24, 16:20-20:7 (Ha transcript).  A former sales agent testified that Son and Chung provided him

23   with a chart showing SNCA's 50 percent annual trading returns.  *See id.* ¶ 14 & Exh. 13 at 5:4-

24   13, 14:7-11, 15:19-24, 16:20-19:4, 20:23-21-6, 36:1-37-15 (Ha transcript).  Son and Chung also

25   provided the former sales agent with other promotional materials for the sales agent to use in

26   contacts with potential investors.  *See id.* ¶ 14 & Exh. 13 at 14:7-11, 15:19-24, 16:20-19:4, 20:9-

27   22:4; 35:22-38:15, 42:1-7, 43:2-46:13, 62:5-25, 93:6-21 (Ha transcript); Exh. 14 (SNCI

28   marketing materials included in testimony Exhibit Nos. 23A, 23B, and 23C).  The sales agent

distributed these materials to potential investors and repeated Son and Chung's description of SNCA's program to them.  *See id.* ¶¶ 2, 3, 14 & Exh. 1 ¶¶ 3, 8 (Yatsko Decl.); Exh. 2 ¶ 5 (Pak Decl.); Exh. 13 at 25:5-13, 38:6-9, 42:1-7, 43:1-11, 45:19-47:12, 62:5-25, 76:13-78:2 (Ha transcript).

After committing their funds, some investors received unsecured, one-year, renewable promissory notes, signed by Son or Chung, which stated the rate of return the investors would receive.  *See* Eme Decl. ¶¶ 2, 3, 9, 14 & Exh. 1 ¶¶ 8-9 & Tabs D, E, H (Yatsko Decl.); Exh. 2 ¶¶ 9, 12 & Tab B (Pak Decl.); Exh. 8 at 13:13-14, 52:25-53:2 (J. Choi transcript); Exh. 13 at 129:3-9 (Ha transcript).  SNCA mailed some investors monthly checks, signed by either Son or Chung, paying them their purported "returns" on SNCA's forex trading program.  *See id.* ¶¶ 9, 14 & Exh. 8 at 14:14-16, 32:11-16, 33:13-25, 34:8-35:7 (J. Choi transcript); Exh. 13 at 40:5-41:6 (Ha transcript).  (Other investors let the returns accumulate in their accounts.  *See id.* ¶ 9 & Exh. 8 at 34:8-11 (J. Choi transcript)).

SNCA mailed investors monthly account statements purporting to show the steady returns the accounts were earning and the current balances in the accounts.  *See* Eme Decl. ¶¶ 2, 3, 9, 10, 14 & Exh. 1 ¶¶ 10, 13 & Tabs F, J (Yatsko Decl.); Exh. 2 ¶ 13 & Tab C (Pak Decl.); Exh. 8 at  13:7-10, 13:23-14:2, 58:24-63:2 (J. Choi transcript); Exh. 9 (SNCA account statements); Exh. 13 at 68:8-12 (Ha transcript).  Both a former SNCA administrative employee who prepared the statements and the former SNCA sales agent testified about discussing the statements with Chung and Son.  *See id.* ¶¶ 9, 14 & Exh. 8 at 4:1-6:13, 11:21-15:13, 62:6-63:2, 65:7-15 (J. Choi transcript); Exh. 13 at 65:24-67:12 (Ha transcript).  Chung's signature appears on letters to investors encouraging them to view the account statements on a private Web site.  *See id.* ¶¶ 14, 17 & Exh. 13 at 154:7-155:10 (Ha transcript); Exh. 16 (letters sent to SNCI investors signed by Chung).

## B.     Son and Chung Operated SNCA's Forex Program as a Ponzi Scheme

Contrary to what investors were told, SNCA conducted little or no forex trading.  The monthly return checks sent to investors were funded not with forex trading profits, but with new investor funds and cash infusions from Son, Chung, SNCI, and a Korean entity controlled by

1   Chung.  The monthly investor account statements depicted trading returns and account balances

2   that did not exist; the promissory notes embodied false promises of returns; and the forex trading

3   monitors on display for investors to see at the SNCA office were just for show.  After the scheme

4   collapsed in October 2008, Chung admitted to the former SNCA sales agent that SNCA had been

5   faking its forex trading returns.  *See* Part II(D), *infra* (citing Eme Decl. ¶ 14 & Exh. 13 at 110:8-

6   111:11, 112:1-114:23 (Ha transcript)).

### 1.      Analysis of Transfers Into and Out of SNCA Bank Account

8          An analysis of the last year of activity in SNCA's bank account reveals that Son and

9   Chung operated SNCA as a Ponzi scheme.  At Son and Chung's direction, most of the funds

10  SNCA raised from investors were deposited in a common bank account held by SNCA and

11  controlled by Son and Chung.  *See* Eme Decl. ¶ 9 & Exh. 8 at 28:18-30:14, 32:3-10 (J. Choi

12  transcript); *see also id.* ¶¶ 9, 13 & Exh. 8 at 80:17-81:14 (J. Choi transcript); Exh. 12 at 1 (SNCA

13  bank records and account statements).

14         Deposits into SNCA's bank account from mid-October 2007 through mid-November

15  2008 totaled approximately $20.5 million in the following amounts:

16         •      $13,396,505 from SNCA investors;

17         •      $2,215,000 from Chung;

18         •      $1,849,880 from KR Futures Co. Ltd. ("KR Futures");

19         •      $1,091,837 from SNCI;

20         •      $902,000 from Son;

21         •      $377,000 from Son's relatives; and

22         •      $649,594 from other miscellaneous sources.

23  *See id.* ¶ 5 & Exh. 4 at Tab A (schedule of SNCA bank deposits prepared by Commission staff).

24         During the same time period (mid-October 2007 through mid-November 2008),

25  approximately $21 million flowed out of the SNCA account:

26         •      $11,309,878 to investors;

27         •      $2,498,916 to Son;

28         •      $1,240,000 to SNCI;

1        •    $1,221,934 to Pacific Investment Group, Inc.;

2        •    $1,125,376 to Chung;

3        •    $1,025,170 to Son's relatives;

4        •    $292,933 to KR Futures; and

5        •    $2,301,381 for business, personal, and miscellaneous expenses unrelated

6              to forex trading.

7 *See id.* ¶ 5 & Exh. 4 at Tab B (schedule of SNCA bank withdrawals prepared by Commission

8 staff).

9        As described below, this overview of deposits and outflows indicates that Son and Chung

10 misled SNCA investors when they described how investor money would be used for forex

11 trading and that investor "returns" were generated by forex trading profits. Approximately $16.5

12 million of the funds deposited into the SNCA account was from investors and cash from Son and

13 Chung. These deposits—not forex trading profits—account for roughly 80 percent of all of the

14 funds that flowed into the account. Similarly, bank account records indicate that roughly $15

15 million was transferred from SNCA's account back to investors and directly to Son and Chung.

16 These funds—representing more than 70 percent of the outflow from the account during the

17 period—were not used in forex trading. *See id.* ¶ 5 & Exh. 4 at Tabs A, B (schedules of SNCA

18 bank withdrawals prepared by Commission staff)

19        The bulk of the remaining funds were transferred to and from SNCI, KR Futures, and

20 Pacific Investment Group. Bank records and the testimony of former employees indicate that

21 none of these entities conducted forex trading on behalf of SNCA:

22        The former managing director of SNCI testified that he was familiar with his firm's

23 customers and had no knowledge of it trading forex on behalf of SNCA. *See* Eme Decl. ¶ 6 &

24 Exh. 5 at 16:9-12, 37:25-38:12, 47:11-48:17 (Y. Choi transcript). In fact, the managing director

25 testified that he tried without success to get Son to use SNCI to conduct SNCA's trading. *See*

26 *id.* ¶ 6 & Exh. 5 at 66:20-68:10, 138:10-139:3. Furthermore, SNCI provided funds to SNCA on

27 just two occasions (in November 2007 and September 2008) (*see id.* ¶ 5 & Exh. 4 at Tab D

28 (schedule of SNCA bank account prepared by Commission staff)), which is inconsistent with the

1  notion that SNCA regularly used SNCI to conduct forex trading.  Finally, SNCI received more in

2  funds from SNCA ($1.2 million) than it returned to SNCA ($1.1 million) (*see id.* ¶ 5 & Exh. 4 at

3  Tab D), a net outflow that does not substantiate SNCA's reported gains in forex trading.

4       According to former SNCA and SNCI employees, KR Futures is a Korean company

5  controlled by Chung.  *See id.* ¶¶ 6, 9, 14 & Exh. 5 at 10:25-12:6, 13:14-22, 16:9-12, 38:13-39:23,

6  95:4-25 (Y. Choi transcript);  Exh. 8 at 73:2-23 (J. Choi transcript); Exh. 13 at 28:18-29:8,

7  122:9-124:23 (Ha transcript).  The analysis of the SNCA bank account activity shows that

8  KR Future's deposits into the SNCA account did not begin until July 28, 2008 (*see id.* ¶ 5 &

9  Exh. 4 at Tab C (schedule of SNCA bank account prepared by Commission staff)), meaning that

10 KR Futures necessarily could not have returned any profits related to forex trading to SNCA

11 during the nine months from November 2007 through late July 2008.  Moreover, SNCA made

12 only one transfer of funds to KR Futures (approximately $300,000 in September 2008) (*see id.*

13 ¶ 5 & Exh. 4 at Tab C), indicating that SNCA did not routinely send funds to KR Futures, as one

14 would expect if KR Futures conducted forex trading on behalf of SNCA.

15      Pacific Investment Group, which received about $1.2 million from SNCA during the

16 period, is a company associated with the former SNCA sales agent.  *See* Eme Decl. ¶ 14 &

17 Exh. 13 at 57:24-58:11 (Ha testimony).  According to the former sales agent's testimony, Pacific

18 Investment Group received the SNCA funds as payment of salary and sales commissions, not to

19 fund forex trading on behalf of SNCA.  *See id.* ¶ 14 & Exh. 13 at 23:6-24:15, 57:24-59:22,

20 139:7-144:1 (Ha testimony).

21      Of the remaining outflows, about $1 million went to Son's wife, brother, and brother-in

22 law, about $1.1 million went to business expenses and apparent real estate transactions, and the

23 rest went to uses facially unrelated to forex trading.  *See* Eme Decl. ¶ 5 & Exh. 4 at Tab B

24 (schedule of SNCA bank account prepared by Commission staff).

25          **2.     Comparison of Bank Records and Investment Account Statements**

26      A comparison of one typical investor's SNCA account statements and the SNCA bank

27 account statements illustrates SNCA's misrepresentations to its investors.  According to the

28 SNCA account statements, (1) the investor received "returns" on his investment even though

1    SNCA conducted no apparent forex trading, and (2) the balance in the SNCA bank account was

2    at times far less than the SNCA account statements reflected.

3        On April 2, 2008, SNCA's bank account was overdrawn and had a negative balance.  *See*

4    Eme Decl. ¶ 18 & Exh. 17 at BA 000086 (SNCA bank account statements).  On April 9, 2008,

5    $500,000 was deposited into the SNCA bank account from a single investor.  *See id.* ¶¶ 9, 13,

6    18 & Exh. 8 at 80:17-82:1 (J. Choi transcript); Exh. 12 (including SNCA bank account slip and

7    other investor check and deposit receipts); Exh. 17 at BA 000087 (SNCA bank account

8    statements).  By April 15, 2008, a week after the deposit, the bank account balance was back

9    down to roughly $290,000.  *See id.* ¶ 18  & Exh. 17 at BA 000088 (SNCA bank account

10   statements).  In early July 2008, the account balance dipped below $100,000; in early August

11   2008 it went below $150,000; and on September 3, 2008, it stood at about $250,000.  *See id.* ¶ 18

12   & Exh. 17 at BA 000106, 000112, 000118 (SNCA bank account statements).

13       Between April and September 2008, meanwhile, the investor received $45,000 in cash

14   from SNCA in purported forex "returns."  *See* Eme Decl. ¶¶ 9,13 & Exh. 8 at 80:17-82:1 (J. Choi

15   transcript); Exh. 12 (SNCA bank account deposit slips).  As described in the preceding section,

16   however, SNCA's bank account statements reveal no forex trading activity.  *See* Part II(B)(1),

17   *supra*.  The purported returns were funded by other investors' money or by deposits from Son,

18   Chung, KR Futures, or other sources, including Son's family.  *Id.*

19       At the same time, SNCA provided the investor with misleading monthly account

20   statements, which reflected the investor's initial $500,000 investment.  *See id.* ¶ 10 & Exh. 9

21   (including investor's SNCA account statements).  These statements provided the false

22   reassurance that the investor's funds remained segregated and under the control of SNCA.  As

23   shown in the bank account activity, however, SNCA did not establish separate accounts for each

24   investor and did not have sufficient cash on hand to return the investor's balance.

25           **3.      Bank Account Records Show the Diversion, Comingling, and Misuse
                        of SNCA Investor Funds**

26

27       The SNCA bank account activity shows that Son and Chung used funds from the SNCA

28   account for personal expenses and for purposes unrelated to forex trading.  For example, funds

1    from SNCA's bank account were used to pay the mortgage on Son's $2.6 million home in

2    Danville, California.  *See* Eme Decl. ¶¶ 5, 9, 11, 12 & Exh. 4 at Tab B (schedule of SNCA bank

3    withdrawals prepared by Commission staff); Exh. 8 at 84:10-16 (J. Choi transcript); Exh. 10

4    (including checks to pay mortgage); Exh. 11 (closing statements for Son's home).  Funds were

5    also used to pay other personal expenses and to pay his wife a salary of $3,000 per month

6    although she did no work for SNCA.  *See id.* ¶¶ 5, 9 & Exh. 4 at Tab B (schedule of SNCA bank

7    withdrawals prepared by Commission staff); Exh. 8 at 88:2-89:21, 90:22-93:25, 94:12-14 (J.

8    Choi transcript); *see also id.* ¶ 6 & Exh. 5 at 53:8-13 (Y. Choi transcript) (identifying Ann Lee as

9    Son's wife).

10        SNCA apparently used investor funds to prop up SNCI.  According to the former SNCA

11   administrative employee, Son directed SNCA to transfer funds from its bank account to maintain

12   SNCI's required capital level.  *See* Eme Decl. ¶ 9 & Exh. 8 at 30:25-31:5, 43:12-44:21 (J. Choi

13   transcript); *see also id.* ¶ 6 & Exh. 5 at 17:10-22, 86:22-87:9 (Y. Choi transcript) (describing the

14   net capital requirement and an apparent "capital infusion" from SNCA).

15        Ultimately, the bank account activity reveals SNCA's precarious financial state in the last

16   year of the scheme.  Apparently because SNCA was strapped for cash, Son and Chung at times

17   used their personal bank accounts to pay purported returns to some investors.  *See* Eme Decl.

18   ¶¶ 9, 14 & Exh. 8 at 100:15-19 (J. Choi transcript); Exh. 13 at 32:12-24, 103:7-21 (Ha

19   transcript).

20        **C.      Son and Chung Used SNCI to Bolster the SNCA Fraud**

21        Son and Chung touted SNCI's supposed success in the forex industry to attract investors

22   to SNCA.  Potential SNCA investors received a copy of a brochure that identified Son as the

23   CEO and founder of SNCI.  *See* Eme Decl. ¶¶ 3, 14, 15 & Exh. 2 ¶ 5 & Tab A at CFTC 000012

24   (Pak Decl.); Exh. 13 at 20:13-21:23, 42:1-44:7 (Ha transcript); Exh. 14 (SNCI marketing

25   materials included in testimony Exhibit Nos. 23B and 23C, referring to the company's San

26   Francisco office).  (Son and Chung served as CEO and CFO, respectively, of SNCI.  *See id.* ¶ 6

27

28

1   & Exh. 5 at 20:19-21, 37:22-24 (Y. Choi transcript)).  SNCI offered individual accounts to

2   investors, who could direct their own foreign currency trading through SNCI.[3]

3     According to the brochure, SNCI had its "U.S. Headquarters" located on Wall Street.  *See*

4   Eme Decl. ¶ 3 & Exh. 2 ¶ 5 & Tab A at CFTC 000008 (Pak Decl.).  The brochure assured

5   investors that SNCI was registered with the Commodity Futures Trading Commission and

6   subject to regulatory oversight.  *See id.* ¶ 3 & Exh. 2 ¶ 5 & Tab A at CFTC 000014 (Pak Decl.);

7   *see also id.* ¶ 15 & Exh. 14 (SNCI marketing materials included in testimony Exhibit Nos. 23B

8   and 23C).  Calling forex "the most robust financial market in the world," the brochure stated that

9   SNCI provided commodity pool operator services and was staffed with a "group of highly-

10  qualified industry experts."  *See id.* ¶ 3 & Exh. 2 ¶ 5 & Tab A at CFTC 000016, 20 (Pak Decl.).

11  The brochure further stated that SNCI emphasized "risk management" and was committed to

12  "high ethical standards."  *See id.* ¶ 3 & Exh. 2 ¶ 5 & Tab A at CFTC 000016 (Pak Decl.).

13    SNCA investors also received a purported excerpt from Business Week magazine stating

14  that SNCI was "bringing the potential of the forex market to the personal investor" and "gaining

15  recognition as one of the leading forex broker-dealers in the industry."  *See* Eme Decl. ¶¶ 2, 3,

16  14, 15 & Exh. 1 ¶ 3 and Tab A (Yatsko Decl.); Exh. 2 ¶ 5 and Tab A (Pak Decl.); Exh. 13 at

17  20:13-21:23, 42:1-7, 45:7-47:12 (Ha transcript); Exh. 14 (SNCI marketing materials included in

18  testimony Exhibit No. 23D).

19    The former SNCA sales agent testified that Son and Chung provided him with the SNCI

20  brochure and purported Business Week excerpt described above, for the sales agent to use in

21  contacts with potential SNCA investors.  *See* Eme Decl. ¶¶ 14, 15 & Exh. 13 at 14:7-11, 15:19-

22  24, 16:20-19:4, 20:9-22:4; 35:22-38:15, 42:1-7, 43:2-46:13, 62:5-25, 93:6-21 (Ha transcript);

23  Exh. 14 (SNCI marketing materials included in testimony Exhibit No. 23C).  The former sales

---

[3] SNCI ostensibly focused on attracting individual retail investors to trade forex on their own through SNCI's platform.  *See* Eme Decl. ¶ 6 & Exh. 5 at 13:5-22 (Y. Choi transcript).  SNCI also conducted its own "proprietary" trading in the forex markets.  *See id.* & Exh. 5 at 23:15-24:3, 33:6-9, 79:11-13.

1   agent's testimony indicates that the Business Week excerpt was an advertisement, but was

2   altered to appear like an article.  *See id.* ¶ 14 & Exh. 13 at 46:14-48:1 (Ha transcript).

3       Contrary to the purported Business Week article's claim that SNCI was gaining

4   prominence in the forex industry, testimony from SNCI's former managing director depicts

5   SNCI as a struggling small firm.  *See* Eme Decl. ¶ 6 & Exh. 5 at 57:24-58:20, 66:20-68:10, 77:2-

6   15, 81:20-25, 119:18-25, 136:4-139:3 (Y. Choi transcript).  The former managing director also

7   testified that as far as he was aware, SNCI never made 50 percent annual returns in its own

8   proprietary forex trading.  *See* Eme Decl. ¶ 6 & Exh. 5 at 89:3-22 (Y. Choi transcript).  To the

9   contrary, according to the former managing director, SNCI lost money in such trading and Son

10  and Chung knew of those losses or were positioned to know of them.  *See id.* ¶¶ 6, 7, 8 & Exh. 5

11  at 33:10-24, 37:2-24, 97:11-101:10, 108:6-109:5, 115:5-11, 122:18-124:2 (Y. Choi transcript);

12  Exh. 6 (SNCI letters to Commodity Futures Trading Commission and National Futures Trading

13  Association in Aug. and Sept. 2006); Exh. 7 (SNCI letters to Commodity Futures Trading

14  Commission and National Futures Trading Association in Feb. and Mar. 2007).  In May 2008,

15  the National Futures Association charged SNCI with failing to maintain required capital and

16  using misleading promotional materials.  *See id.* ¶ 20 & Exh. 19 (NFA hearing panel decision

17  dated Sept. 30, 2008).

18       **D.      Son and Chung Diverted Funds Shortly Before the Collapse of the Scheme**

19       SNCA and SNCI abruptly ended communications with customers in late October 2008.

20  Son stopped coming into SNCA's office, and SNCA and SNCI employees could not reach him.

21  *See* Eme Decl. ¶¶ 2, 6, 9 & Exh. 1 ¶ 14 (Yatsko Decl.); Exh. 5 at 28:5-30:23, 48:18-25, 105:7-10

22  (Y. Choi transcript); Exh. 8 at 65:7-67:24, 69:10-70:2 (J. Choi transcript).  A sign appeared on

23  SNCA's office door saying it was no longer conducting business and directing inquiries to an

24  attorney.  *See id.* ¶¶ 2, 9 & Exh. 1 ¶ 14 (Yatsko Decl.); Exh. 8 at 69:10-70:2 (J. Choi transcript).

25       The former sales agent confronted Chung about SNCA's closing.  *See* Eme Decl. ¶ 14 &

26  Exh. 13 at 110:8-111:11, 112:1-114:23 (Ha transcript).  According to the sales agent, Chung

27  admitted that SNCA had been faking its forex trading returns.  *See id.* ¶ 14 & Exh. 13 at 114:5-

28  23 (Ha transcript).

1    Toward the end of the scheme and earlier, SNCA diverted substantial investor funds to

2    Son.  In May 2008, SNCA transferred $150,000 to Son's account at a South Korean bank.  *See*

3    Eme Decl. ¶¶ 5, 21 & Exh. 4 at Tab E (schedule of SNCA bank account prepared by

4    Commission staff); Exh. 20 (printout of information concerning Hana Bank in South Korea).  In

5    the roughly two months before SNCA closed, approximately $1.7 million was transferred from

6    SNCA's bank account to Son.  *See id.* ¶ 5 & Exh. 4 at Tab E (schedule of SNCA bank account

7    prepared by Commission staff).

8    SNCA also transferred $700,000 to SNCI's account at Hana Bank in the three months

9    before the shut down.  *See* Eme Decl. ¶ 5 & Exh. 4 at Tab D (schedule of SNCA bank account

10   prepared by Commission staff).  (In the last year of the scheme, SNCA transferred more than a

11   total of $1.2 million to SNCI's Hana Bank account starting in November 2007.  *See id.*)

12   In the weeks surrounding SNCA's and SNCI's closure, their bank accounts were drained.

13   By mid-November 2008, the two accounts each held less than $2,000.  *See* Eme Decl. ¶ 18 &

14   Exh. 17 at BA 00129 (SNCA bank account records); Exh. 18 at BA 000034 (SNCI bank account

15   records).

16   In the last months of the scheme, SNCA's bank account contained only a fraction of the

17   funds it claimed it held according investor account statements.  A sampling of account

18   statements purports to show a total of at least $8 million in some of the largest accounts as of late

19   September 2008.  *See* Eme Decl. ¶ 10 & Exh. 9 (SNCA account statements).  These statements

20   were mailed to investors (*see id.* ¶ 9 & Exh. 8 at 63:6-23 (J. Choi transcript); Exh. 9 (SNCA

21   account statements), yet the monthly closing balances for SNCA's bank account in September

22   and October 2008 were about $600,000 and $120,000 respectively.  *See id.* ¶ 18 & Exh. 17 at BA

23   000115, 000122 (SNCA bank account records).

24   **III.    ARGUMENT**

25         **A.    The Standard for Ordering Emergency Relief**

26         The Commission seeks a temporary restraining order from the Court pursuant to

27   Section 20(b) of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the Securities

28   Exchange Act of 1934 ("Exchange Act").  The Securities Act provides in pertinent part:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title . . . the Commission may, in its discretion, bring an action in any district court ... to enjoin such acts or practices, *and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.*

15 U.S.C. § 77t(b) (emphasis added); *see also* 15 U.S.C. § 78u(d) (authorizing temporary injunctive relief under the Exchange Act on same basis).

When the Commission seeks a temporary restraining order pursuant to these statutes, relief is appropriate upon a showing of *either*:  (1) a likelihood of success on the merits and the possibility of irreparable injury; *or* (2) serious questions going to the merits and the balance of hardships tipping sharply in the Commission's favor.  *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003) (*en banc*).  In hearing the Commission's motion, due to the exigencies, the Court has discretion to accept hearsay and other evidence that might be inadmissible at trial.  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

Where, as here, the Commission brings an action to safeguard the public interest and to enforce the federal securities laws, irreparable injury should be presumed when it shows a likelihood of success on the merits.  *See United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 175-76 (9th Cir. 1987) (ruling that irreparable injury is presumed when federal agency charged with enforcement responsibility brings action for injunctive relief); *Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722 F.2d 449, 453 (9th Cir. 1983) (same); *cf. Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 459 (9th Cir. 1994) (ruling that irreparable injury presumed when agency makes sufficient showing of likelihood of success).  The Commission thus is not required to prove irreparable injury or the inadequacy of legal remedies, as may be required of a private litigant.  *Cf.* Fed. R. Civ. P. 65(b)(2).  Instead, the relief should be granted when the Commission meets the statutory requirement of showing a likelihood of continued violations of the securities laws, since the agency appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest."  *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).

1   As discussed below, the Commission's evidence establishes that Son, Chung, SNCA, and

2   SNCI violated the antifraud provisions of the federal securities laws.  The Commission's

3   evidence further indicates that defendants will likely continue to defraud investors of their funds

4   and dissipate the funds for defendants' own purposes absent a restraining order and the other

5   relief sought by the Commission.

6   **B.      Defendants Violated the Federal Securities Laws**

7   Son and Chung fraudulently induced investors to invest in SNCA's purported forex

8   trading program.  As explained below, defendants violated the antifraud provisions of the

9   securities laws by operating SNCA as a Ponzi scheme.

10  **1.      The SNCA Forex Investments and Promissory Notes Are "Securities"**

11  Both the Securities Act and the Exchange Act define "security" to include an "investment

12  contract."  U.S.C. § 77b(a)(1) (Securities Act definition); 15 U.S.C. § 78c(a)(10) (Exchange Act

13  definition).  An investment contract is an investment of money in a common enterprise with the

14  expectation of profits to be derived solely from the efforts of others.  *SEC v. W. J. Howey Co.*,

15  328 U.S. 293, 298-99 (1946).  Here, investor funds were purportedly to be pooled for forex

16  investment in a program managed by SNCA.  The investments in SNCA's program were thus

17  securities.  *See SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1199-1203 (11th Cir.

18  1999) (finding that a commodities pool purportedly that would trade in foreign currency options

19  is an investment contract).

20  Some investors received promissory notes from SNCA.  The Securities Act and the

21  Exchange Act include "any note" in the definition of "security."  *See* 15 U.S.C. § 77b(a)(1);

22  15 U.S.C. § 78c(a)(10).  Notes are presumed to be securities unless they fall into certain

23  judicially created categories that are plainly not securities.  *Reves v. Ernst & Young*, 494 U.S. 56,

24  65-69 (1990) (setting forth a four-part test for rebutting the presumption).  The SNCA

25  promissory notes, which do fall with in the *Reves* exclusion, are thus presumptively securities.

26  *See id.*  Accordingly, defendants' forex program involved the offer and sale of securities within

27  the meaning of the Securities Act and Exchange Act.

28

1

### 2.   Son, Chung, SNCA, and SNCI Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

2      The Commission alleges that Son, Chung, SCNA, and SNCI violated the antifraud

3  provisions of the federal securities laws.  *See* Compl. ¶¶ 30-36 (stating claims for violations of

4  Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5

5  thereunder).  Section 17(a) of the Securities Act prohibits fraud in the "offer or sale" of

6  securities.  15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

7  prohibit fraud "in connection with the purchase or sale" of securities.  15 U.S.C. § 78j(b); *see*

8  17 C.F.R. § 240.10b-5.

9      The antifraud provisions prohibit:  (1) employing any device, scheme or artifice to

10  defraud; (2) making material misstatements of fact or omitting to state material facts necessary to

11  make statements made not misleading; and (3) engaging in any act or practice that operates as a

12  fraud.  *See, e.g., SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001) (citing the

13  antifraud provisions).  Section 17(a)(2) requires additional proof that the defendant obtained

14  "money or property" through the alleged misrepresentations.  15 U.S.C. § 77q(a)(2); *see*

15  *Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003).[4]

16      Son, Chung, and SNCA lured hundreds of investors with promises of annual returns of up

17  to 36 percent based on SNCA's purported success in forex trading.  After investors committed

18  their funds, Son, Chung, and SNCA provided them with account statements purporting to show

19  the existing investment balances and forex trading returns.  In truth, SNCA was a Ponzi scheme

20  that paid investor returns only by raising new money and through cash infusions from Son and

21  Chung.  Defendants' misrepresentations and omissions about the SNCA forex trading program

22  thus occurred in the offer and sale of the SCNA investments.  *See Vernazza*, 327 F.3d at 858.

23  Defendants' subsequent misrepresentations and omissions about the source of the purported

24

_____

25  [4] The nexus required by Section 10(b) and Rule 10b-5 between the alleged violative conduct and
26  the purchase or sale of a security is satisfied if a scheme to defraud coincides with the purchase
   or sale of securities, whether or not accompanied by a particular misrepresentation or omission.
27  *SEC v. Zandford*, 535 U.S. 813, 820-22 (2002); *Simpson v. AOL Time Warner Inc.*, 452 F.3d
   1040, 1050-51 (9th Cir. 2006) (reasoning that misrepresentations about a company's revenue
28  may coincide with the purchase or sale of securities and thus satisfy the requirement).

1    "returns" and in the account statements provided to investors occurred in furtherance of, and

2    "coincided with," the investment scheme and thus satisfy the required nexus with the purchase

3    and sale of securities.  *See Zandford, supra* n.4, 535 U.S. at 820-22.  Son, Chung, SNCA, and

4    SNCI received investor funds ("money or property") in the offer and sale of the investment in

5    SNCA.  *See Vernazza*, 327 F.3d at 858.

6         Defendants' misrepresentations were material to investors.  Information is material if

7    there is a substantial likelihood that it would have assumed actual significance in the investment

8    deliberations of a reasonable investor, or that disclosure of the misstated or omitted fact would

9    have significantly altered the "total mix" of information available to the reasonable investor.

10   *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*,

11   426 U.S. 438, 449 (1976)).  "Surely the materiality of information relating to financial condition,

12   solvency and profitability is not subject to serious challenge."  *SEC v. Murphy*, 626 F.2d 633,

13   653 (9th Cir. 1980); *see Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (finding that

14   omissions and misrepresentations about "the use of investor funds" material).  Here, defendants'

15   misrepresentations to investors went to the heart of the supposed investment:  they

16   misrepresented the existence of SCNA's forex investment program, the source of the purported

17   "returns" provided to investors, and the safety of investors' funds.

18        Son, SNCA's CEO, and Chung, SNCA's CFO, purposefully swindled investors.

19   Scienter, or intentional deception, is required to establish violations of Section 17(a)(1),

20   Section 10(b), and Rule 10b-5.  *Aaron v. SEC*, 446 U.S. 680, 691, 696-97 (1980).  In the Ninth

21   Circuit, "scienter is satisfied by recklessness."  *Dain Rauscher*, 254 F.3d at 856; *Hollinger v.*

22   *Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (*en banc*); *see Vernazza*, 327 F.3d

23   at 860.  Violations of Sections 17(a)(2) and 17(a)(3) require only a showing of negligence.  *Dain*

24   *Rauscher*, 254 F.3d at 856; *see Aaron*, 446 U.S. at 696-97.  Son and Chung solicited investors,

25   distributed marketing materials for investors, controlled SNCA's bank account, and transferred

26   investor funds into and out of the account.  They therefore knew, or were reckless in not

27   knowing, that SNCA conducted little or no forex trading, as investors were led to believe.

28

1       Son and Chung also were the CEO and CFO of SNCI, which lent its name and supposed

2   rising profile in the forex industry to the scheme.  In reality, SNCI was a struggling small firm

3   that lost money in the forex markets.  Although it did not trade for SNCA, SNCI received at least

4   $1.2 million in its offshore bank account from SNCA, thus participating in misappropriation of

5   investor funds.[5]

6       Because Son and Chung controlled SNCA and SNCI, their scienter can be imputed to the

7   entities.  *See, e.g., SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972)

8   (attributing scienter to entities over which defendant "exercised blanket authority in the matter of

9   securities transactions").

10      **C.      Injunctive and Other Relief is Necessary to Prevent Further Fraud and
                Preserve Investor Funds**

11

12              **1.      Restraining Order and Preliminary Injunction**

13      As set forth above, the Commission's evidence of defendants' fraud establishes a

14  likelihood of the Commission's success on the merits.  Although irreparable injury should be

15  presumed, the evidence makes clear that defendants misappropriated investor funds and that

16  existing investors will be harmed through the continuing loss of access to their funds.

17  Defendants should not be permitted to solicit new funds.  Without an injunction, defendants

18  would be free to, and motivated to, solicit money from other investors.  Because the evidence

19  indicates a likelihood that defendants will continue to deprive investors of their funds and engage

20  in fraudulent conduct, the statutory requirements both for a restraining order and a preliminary

21  injunction are thus readily met.  *Sw. Voter Registration Educ. Project*, 344 F.3d at 917.

22      Accordingly, the Commission requests that the Court enter an order prohibiting

23  defendants from violating the antifraud provisions of the federal securities laws.  In order to

24  address the specific harm to clients in this case, and to maintain the status quo during the

25  _____

26  [5] The Commission alternatively alleges that SNCI aided and abetted the other defendants'
    violations of Section 10(b) and Rule 10b-5.  *See* Compl. ¶ 36.  The Commission's evidence
27  supporting this application is sufficient to show a likelihood of establishing that SNCI knowingly
    provided substantial assistance to Son, Chung, and SNCA's fraud.  *See SEC v. Fehn*, 97 F.3d
28  1276, 1288 (9th Cir. 1996) (setting forth elements of aiding and abetting).

1  pendency of the litigation, the Commission requests that the Court further restrain and enjoin

2  defendants from making any transfers of money into or out of or otherwise exerting their control

3  or influence over the brokerage or bank accounts as set forth in the Commission's proposed

4  order.

5                          **2.      Asset Freeze**

6          An order freezing bank and other financial accounts in defendants' names, and in the

7  names of entities that defendants own and control, is necessary to ensure that sufficient funds are

8  available to satisfy a final judgment and to prevent their immediate dissipation.  This Court has

9  the inherent equitable authority to issue ancillary relief in Commission injunctive actions,

10  including the freezing of accounts or assets.  *SEC v. Hickey*, 322 F.3d 1123, 1131-32 (9th Cir.

11  2003); *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Wencke*, 622

12  F.2d 1363, 1369 (9th Cir. 1980).

13          An asset freeze is appropriate to prevent waste and dissipation of assets while litigation is

14  pending, and to ensure their availability for equitable relief, such as restitution and disgorgement.

15  *See, e.g., FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982).  Where the

16  Commission has shown that it is likely to succeed on the merits, the mere possibility of

17  dissipation of assets is sufficient to warrant an asset freeze; the Commission does not need to

18  show that dissipation has occurred or is imminent.  *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th

19  Cir. 1989) (reversing denial of asset freeze on grounds that a finding of likelihood of dissipation

20  was not required).  Moreover, an ancillary remedy may be granted, even in circumstances where

21  the elements required to support a traditional injunction have not been established.  *SEC v.*

22  *Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (citation omitted).

23          An order freezing defendants' assets is critical in this matter.  Defendants have obtained

24  millions of dollars from investors and transferred large portions of the proceeds to themselves

25  and offshore accounts.  Defendants should not be given the further opportunity to hide or

26  dissipate assets.

27          In addition to an order directed to defendants, the Commission requests that the Court

28  order financial institutions holding assets on behalf of each defendant to freeze the accounts

immediately.  Also, because as set forth above, the Commission has demonstrated a likelihood of success on the merits—the step required for extending a temporary asset freeze during the pendency of the litigation to a preliminary injunction—the Commission also requests that the Court order defendants to establish why the temporary asset freeze should not be kept in place while this litigation is pending.

### 3.    Accounting of Investor Funds

Son and Chung repeatedly boasted about SNCA's superior performance.  Defendants took upon themselves the commitment to hold investor funds and were entrusted to account for them.  In light of SNCA bank account activity and defendants' refusal to return investor funds to date, the Commission requests that this Court enter an order requiring defendants to submit a verified accounting of SNCA and their custody of investor funds.  The accounting would have the purpose of identifying:  (i) the location and disposition of all funds received from investors; (ii) the location and disposition of all financial accounts controlled by defendants or held for their benefit; and (iii) the location and value of all personal or investor assets currently held by defendants, or under defendants' control or over which they may exercise actual or apparent authority.  The accounting will assist the Court to determine the scope of the fraudulent scheme and the appropriate scope of the asset freeze order.  In addition, an order for an accounting will make it more difficult for defendants to conceal assets in anticipation of a final order requiring disgorgement and civil penalties.  *See, e.g., Int'l Swiss Invs. Corp.*, 895 F.2d at 1274; *H.N. Singer*, 668 F.2d at 1114.

### 4.    Repatriation of Assets

Repatriation of assets held by defendants outside the United States should also be ordered to protect investors from dissipation of assets.  *See SEC v. Bankers Alliance Corp.*, Civ. A. No. 95-0428, 1995 WL 590665, at *18 (D.D.C. May 5, 1995) (holding certain defendants in contempt for failing to repatriate funds as ordered in the court's preliminary injunction).  Here, because defendants appear to have transferred investor funds to South Korea and to have used the funds for undisclosed purposes, and refuse to return investor funds, an order requiring repatriation is appropriate in this case.  Accordingly, the Commission requests that the Court

1   order defendants to repatriate assets to the United States as set forth in the Commission's

2   proposed order.

3             **5.**        **Expedited Discovery and Document Preservation**

4         Because of the urgent need for relief to prevent dissipation of assets, the Commission

5   seeks also expedited discovery in order to determine the extent of the fraud, the disposition of

6   investor funds to date, and to preserve any remaining funds.  The Commission will seek

7   discovery, including depositions and documents, from defendants in order to obtain additional

8   facts related to the fraud.  Accordingly, the Commission requests that the Court permit discovery

9   to begin immediately, before the parties have conferred in accordance with Rule 26(f) of the

10   Federal Rules of Civil Procedure.

11         To protect all remaining documents necessary for full discovery in this matter, the

12   Commission seeks an order preventing the alteration or destruction of documents.  To this point,

13   the Commission does not have access to all of defendants' financial documents.  An order to

14   preserve documents is therefore appropriate to protect the integrity of this litigation.  *See, e.g.,*

15   *SEC v. Chemical Trust,* No. 00-8015-CIV, 2000 WL 33231600, at *13 (S.D. Fla. Dec. 19, 2000).

16   Such "innocuous" orders are routinely granted.  *See, e.g., Unifund SAL*, 910 F.2d at 1040 n.11.

17   **IV.**    **CONCLUSION**

18         In order to prevent Son, Chung, SNCA and SNCI from continuing their fraudulent

19   scheme, and to preserve investor funds, the Commission respectfully requests that the Court

20   enter the proposed Temporary Restraining Order and the Order to Show Cause.

21

22   DATED:  June 8, 2009            Respectfully submitted,

23

24

25                          */s/ Robert L. Tashjian*

26                          ROBERT L. TASHJIAN

27                          Attorney for Plaintiff
                                  SECURITIES AND EXCHANGE COMMISSION

28